## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARY ALSTON, KEVIN COLLIER and BRAD AUGUNAS, | CIVIL ACTION Case No.:  2:07-cv-03508-JG |
| Plaintiffs, | |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS INC. and BALBOA REINSURANCE COMPANY, | |
| Defendants. | |

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Mark K. Gyandoh, Esq.
Joseph A. Weeden, Esq.
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

and-

Alan R. Plutzik, Of Counsel
2125 Oak Grove Blvd., Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

**BERKE, BERKE & BERKE**
Andrew L. Berke, Esq.
420 Frazier Avenue
Chattanooga, TN 37402
Telephone: (423) 266-5171
Facsimile: (423) 265-5307

**TRAVIS & CALHOUN, P.C.**
Eric G. Calhoun, Esq.
1000 Providence Towers East
5001 Spring Valley Road
Dallas, Texas 75244
Telephone: (972) 934-4100
Facsimile: (972) 934-4101

*Attorneys for Plaintiffs*

Plaintiffs Mary Alston, Kevin Collier, and Brad Augunas, ("Plaintiffs")[1] on behalf of themselves and others similarly situated, respectfully submit this memorandum of law in support of their opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Class Acton Complaint ("Motion to Dismiss").

## INTRODUCTION

This is a class action by homeowners seeking relief from the predatory practices of Defendants for violations of their statutory obligations. Plaintiffs' claims are grounded upon a ploy to circumvent federal laws governing residential real estate settlements; specifically, that Defendant Countrywide[2] set up a captive reinsurance scheme to facilitate its collection of hundreds of millions of dollars in illegal kickbacks and unearned fees. This well-hidden illegal "kickback" scheme is in direct contravention of the Real Estate Settlement Procedures Act of 1974[3] ("RESPA") and created an enormous windfall for Defendants by enabling them to receive unfair, baseless and illegal portions of the premiums paid by the unsuspecting Plaintiffs, who were required to purchase private mortgage insurance ("PMI"). As discussed in more detail below, it is clear that this is the quintessential example of the very type of conduct that RESPA was intended to prevent.

Defendants' Motion to Dismiss completely mischaracterizes Plaintiffs' allegations and requests this Court to find that Defendants' scheme to violate the rights of

---

[1] Plaintiffs Jovan Jacobs and Fermin Martinez have dismissed their claims against Defendants since the inception of this case.

[2] Collectively, Defendants Countrywide Financial Corporation and Countrywide Home Loans, Inc. are referred to herein as "Countrywide."

[3] 12 U.S.C. §§ 6701, *et al.*

hundreds of thousands of consumers is not actionable.  In seeking to dismiss Plaintiffs' First Amended Class Action Complaint (the "Complaint"), Defendants make three core arguments: (i) Plaintiffs' claims are barred by the filed-rate doctrine; (ii) pursuant to the *Burford* Abstention Doctrine, this Court should abstain from jurisdiction; and (iii) Mary Alston's claims are time-barred.

First and foremost, the filed-rate doctrine was created for the utilities industry and was *never* intended to eviscerate homeowners' rights under RESPA.  As discussed below, there is relevant and persuasive support that the filed-rate doctrine does not and cannot defeat claims for violations of RESPA.  Indeed, two principles lie at the heart of the filed-rate doctrine: first, that legislative bodies designated agencies for the specific purpose of setting uniform rates for utility services, and second, that courts are not institutionally well suited to engage in retroactive rate setting.  Neither of these principles is applicable to this case.  By asking this Court to enforce RESPA's damage provisions, Plaintiffs are not challenging a filed rate, nor are they asking this Court to engage in retroactive rate setting.  Instead, pursuant to Section 8 of RESPA, 12 U.S.C. § 2607, Plaintiffs are seeking relief for Defendants' violations of RESPA's prohibitions on kickbacks and unearned fees.  Under RESPA, Plaintiffs and the members of the class are entitled to recover three times the amount of the charges they paid for their settlement services. Because this relief is determined by plain reference to charges for settlement services—regardless of the amount of such charges--and *not* the reasonableness of the rates of PMI insurers, this Court would not have to assess the reasonableness of the private mortgage insurance rates to make a damages award to the Plaintiffs.

Second, because RESPA is a federal consumer protection statute, it cannot and should not be preempted by state law, if any, relating to the "filed rate doctrine." Doing so would essentially eviscerate the very purpose of RESPA. Plaintiffs' federal claim is based on a federal statute that explicitly and comprehensively regulates aspects of residential real estate transactions, without making rates. RESPA regulates settlement procedures and prohibits kickbacks and unearned fees, in accordance therewith. Hence, the Pennsylvania Insurance Code does not preclude this Court from deciding Plaintiffs' claim under § 8(b) of RESPA, 12 U.S.C. § 2607(b), as Defendants assert. As noted, Plaintiffs do not challenge PMI insurers' right or duty to charge a regulated rate or challenge any rate set by the Pennsylvania Insurance Department. Defendants cite inapplicable statutes that do not provide the "sole" remedy for an overcharge.

Third, the rates the Pennsylvania Insurance Department approved were themselves artificially inflated, so as to incorporate the costs of paying unlawful kickbacks and unearned fees. Thus, it would defeat the purposes of the filed-rate doctrine to enforce those rates. Lastly, even if the filed-rate doctrine were to be applied, Plaintiffs still sufficiently allege injury in fact to satisfy constitutional standing requirements.

Defendants' arguments that this Court should abstain from jurisdiction per the *Burford* Abstention Doctrine and that Plaintiff Mary Alston's RESPA claims are time-barred are equally unavailing. Primarily, the *Burford* Abstention Doctrine applies to cases seeking equitable relief, whereas the allegations in the instant case are clearly for legal damages. Additionally, application of equitable tolling – clearly applicable to RESPA claims as noted by courts in this district – preserves Plaintiff Alston and other

similarly situated class members' claims. These arguments are fully addressed in the body of this memorandum. Defendants' arguments thus cannot withstand scrutiny.

Lastly, it is telling – dispositive, really -- that Defendants never once deny Plaintiffs' essential allegations – that the private mortgage insurance("PMI")/reinsurance arrangement was a sham, transferring no risk between reinsurer and PMI provider, as evidenced by the non-existence of any payments made by the reinsurers. Both the RESPA statute and relevant regulatory pronouncements from HUD dictate that a "captive" reinsurer such as Balboa Reinsurance Company ("Balboa") must accept a "real transfer of risk" for the portion of the PMI premium ceded to it. Balboa has not. Defendants don't really contest these allegations. They can't. Their motion should be dismissed.

## FACTUAL BACKGROUND

Congress enacted RESPA in 1974 "in order to reduce the costs consumers pay to settle their real estate transactions."[4] Congress found "that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country…. "[5] Through RESPA, Congress sought "to effect certain changes in the settlement process for residential real estate that will result-[¶] (1) in more effective advance disclosure to home buyers and sellers of settlement costs; [and][¶] (2) in the elimination of kickbacks or

---

[4] *Sosa v. Chase Manhattan Mortgage Corp.*, 348 F.3d 979, 981 (11th Cir. 2003).

[5] 12 U.S.C. § 2601(a).

referral fees that tend to increase unnecessarily the costs of certain settlement services…"[6]

The First Amended Complaint in this action (the "Complaint") contains factual allegations -- which must be accepted as true for purposes of this motion - that Defendant Countrywide engaged in a scheme, complex in its mechanics but simple and shrewd in its execution, with its affiliated reinsurer, Defendant Balboa Reinsurance Company ("Balboa"), designed to circumvent RESPA.  ¶ 1.[7]

More specifically, in April 2005, February 2006 and June 2006, Plaintiffs Mary Alston, Kevin Collier and Brad Agunas, respectively, obtained residential mortgage loans from Countrywide for the purchase of a home, with a down payment of less than 20% of the purchase price.  ¶¶ 10,11 and 14.  Because of Plaintiffs' inability to put down the 20%, they were required to pay for PMI. *Id*.  In accordance with Countrywide's requirement, Plaintiffs paid for PMI supplied by a private mortgage insurer selected by the lender—an insurer with whom Countrywide had a captive reinsurance arrangement. ¶¶ 10-14, 57.  However, unknown to Plaintiffs, the arrangement between Defendants and Plaintiffs' PMI providers were, in fact, part and parcel of a complicated scheme devised to hide illegal kickbacks and fee splits indirectly paid to Countrywide by the private PMI providers through its affiliated reinsurer.  Plaintiffs allege that, despite collecting from PMI providers hundreds of millions of dollars as its split of borrowers' premiums, Balboa

---

[6] *Id.,* § 2601(b).

[7] Hereinafter, references to Plaintiffs' First Amended Class Action Complaint are abbreviated as "¶ __ ."

has paid out nothing in claims. ¶¶ 6, 62. This scheme violated RESPA's fee-splitting provisions, as well as the RESPA's prohibition of referral fees and kickbacks.

Plaintiffs allege that, as a result of Defendants' unlawful scheme, they and members of a putative class (the "Class") consisting of all other similarly situated homeowners who obtained residential mortgage loans through Countrywide or any of its subsidiaries and paid for private mortgage insurance issued from insurers with whom Countrywide had captive reinsurance arrangements are entitled to recover from Defendants statutory damages, pursuant to 12 U.S.C. § 2607(d). ¶¶ 71, 93.

The Complaint amply pleads that the statute of limitations for the claims of Plaintiff and the members of the Class was and should be equitably tolled.

First, the Complaint asserts that Defendants knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing, such that Plaintiffs and the Class could not reasonably have discovered the underlying basis for their RESPA claims. ¶ 94.

Furthermore, Plaintiffs allege that Countrywide engaged in affirmative acts to conceal the facts and circumstances giving rise to the Class's RESPA claims. Countrywide provided misleading information to Plaintiffs and the Class, thus affirmatively acting to conceal its unlawful kickback/fee-splitting scheme. Essentially, Countrywide's disclosures to Plaintiffs through loan/settlement paperwork and the Class amounted to affirmative representations that any amounts it received from its captive reinsurance arrangements were for services actually performed. Pursuant to RESPA § 2604(c) and the accompanying regulations set forth in 24 C.F.R. 3500.7, if Countrywide required the use of a particular provider of settlement service, it was obligated to describe

the nature of any relationship between Countrywide and such provider. Countrywide failed to satisfy its disclosure obligations by impermissibly misrepresenting the true nature of its captive reinsurance arrangements with private mortgage insurers -- particularly the fact that the amounts that Plaintiffs and the Class would pay to such insurers included payments to Countrywide's captive reinsurer in excess of the value of any services rendered. ¶¶ 95-96. Therefore, as alleged in the Complaint, it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claims of Plaintiffs or any Class member. ¶ 97.

Plaintiffs adequately allege Defendants' involvement in a complex, undisclosed scheme in which Countrywide collected a portion of Plaintiffs' PMI payments through its affiliated captive reinsurer, Balboa, which far exceeded the value of the services, if any, that Balboa performed. Unbeknownst to Plaintiffs and the Class, there was no real transfer of risk from the PMI providers to Balboa. Discovery will show that any claimed actual risk assumed by Balboa with respect to the insurance obligations of the PMI providers of Plaintiffs and the Class was in no way commensurate with the percentage of the PMI premiums that Balboa collected. Rather, the amounts paid were simply disguised kickbacks to Countrywide for the referral of borrowers to the private mortgage insurers and, further, constituted an unlawful split of settlement service charges. This hidden scheme is a violation of both the letter and spirit of RESPA.

## ARGUMENT

### I.    Standard of Review

In reviewing a motion to dismiss a complaint under Rule 12(b)(6), the Court must determine whether the "[f]actual allegations . . . raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Defendants bear the burden of showing that the Complaint does not provide sufficient notice of a claim for relief that is "plausible on its face." *Id.* at 1960. Further, a court must "accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them." *Williams v. Kort*, 223 Fed. Appx. 95, 99 (3d Cir. 2007).

The Court should be guided further by the fact that RESPA is properly characterized as a remedial statute and, as such, should be construed liberally. *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F. Supp. 2d 1156, 1165-1166 (M.D. Ala. 1999) ("The court finds that both the statutory language of other sections of RESPA and RESPA's legislative history demonstrate that Congress intended RESPA to be a remedial consumer-protection statute . . . [and] must be construed liberally in order to best serve Congress' intent.").

### II.    The Filed Rate Doctrine Does Not Bar This Cause of Action

Defendants' argument regarding the applicability of the filed rate doctrine - which prohibits challenges to rates filed pursuant to a state or federal regulatory scheme - in this matter is hinged on their misperception that Plaintiffs solely argue that "their mortgage

insurance premiums were artificially inflated." Def. Mem.[8] at 3. As a threshold matter, Plaintiffs' arguments are premised on the theory that Defendants committed a RESPA violation by accepting kickbacks and unearned fees. *See* Complaint, ¶¶ 4-7. These kickbacks do not necessarily have to result in an inflated or "unreasonable" insurance rate for liability to lie against Defendants. *See Williams v. Saxon Mortgage Services, Inc., et al.* ("the purpose of Section 8(b) [12 U.S.C. 2607(b)] 'is to prohibit kickback and referral fee arrangements, not to convert every violation of a loan agreement into a violation of [RESPA].") (*citing Duggan v. Independent Mortg. Corp.* 670 F. Supp. 652, 654 (E.D. Va. 1987) (citation omitted)); *Haug v. Bank of America, N.A.,* 317 F.3d 832, 836 (8th Cir. 2003) ("Section 8(b) is an anti-kickback provision").

A sister court explicitly rejected the very same argument presented by Defendants in one of Washington's district court's. *See Blaylock v. First American Title Insurance Co.*, 504 F.Supp.2d 1091 (W.D. Wash., 2007). In rejecting defendants' argument, the court examined the underlying cause of action. Like Plaintiffs' here, the plaintiffs in Blaylock did not directly challenge the reasonableness of the rate, or the quality of the service. *Id.* at 1102. Instead, the plaintiffs challenged the fact that defendants paid kickbacks to acquire more business from others. *Id.* The court agreed with the Ninth Circuit:

> that even if the state regulatory agency intended for the rates to be applied equally, this is not such a strong consideration that other unlawful acts giving rise to independent causes of action should be extinguished by this equality principle.

---

[8] Hereinafter, references to Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiffs' First Amended Class Action Complaint are abbreviated as "Def. Mem."

*Id.* at 1102 n. 9.   The court in *Blaylock* held that the filed rate doctrine did not bar consumers' claims under RESPA.  *Id.*   Similarly, like in this case, although the rates charged by the PMI provider *may* have been inflated it is not crux of Plaintiffs' Complaint.

Another sister court similarly found likewise.  In *Kay v. Wells Fargo & Co.,*  No. 07-CV-01351, 2007 WL 4249854 (N.D. Cal. Nov. 30, 2007) Judge Alsup found as follows:

> This order finds defendants' argument unavailing. Although the Ninth Circuit has yet to rule on the applicability of the filed-rate doctrine to private mortgage insurance, other court decisions indicate an unwillingness to fully bar plaintiffs' RESPA claims.  *See Kahrer v. Ameriquest Mortg. Co.*, 418 F.Supp. 2d 748, 756 (W.D. Pa. 2006); *Moore v. Radion Group, Inc.*, 233 F.Supp. 2d 819, 825 (E.D. Tex 2002).  Statutes like RESPA are enacted to protect consumers from unfair business practices by giving consumers a private right of action against service providers. . . .  Plaintiffs bringing a suit under RESPA may allege a violation of fair business practices through the use of illegal kickback payments. . . .  As such, the filed-rate doctrine cannot bar her claims from going forward.

*Id.* at page 6.

Defendants cite to *Stevens v. Union Planters Corporation*, No. 00-CV-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000) to support their argument that Plaintiffs' claims for RESPA violations are barred by the filed rate doctrine. Def. Mem. at 5.  However, contrary to Defendants' argument, *Stevens* is not analogous to the case at bar.  In *Stevens*, the plaintiff alleged his premiums for "forced placed" insurance were excessive and that the excessive rates were a means for the insurance company to obtain unlawful kickbacks.  *Id.* at *1.  Such is not the case here.

Defendants' arguments, taken to their reasonable conclusion, would hold that there could never be any kick-back violation not matter what nefarious activity is taken by Defendants – as the insurance rates would be rendered reasonable. This is an absurd result. For this and other reasons outlined below, the filed rate doctrine is inapplicable in the instant matter.

**A.    The Filed Rate Doctrine Does Not Apply**

Defendants argue that, under the filed-rate doctrine: (1) the PMI rates paid by Plaintiffs are "per se reasonable and unassailable" in judicial proceedings and, thus, Plaintiffs' claims must be heard by the Pennsylvania Insurance Department; and (2) because the rates in this matter are deemed per se reasonable, Plaintiffs cannot allege an injury, and thereby do not have standing under Article III of the United States Constitution. Def. Mem.[9] pp. 6-12. Related to these arguments, Defendants also argue that RESPA's safe harbor provision - Section 8 (c) - protects Defendants since the charged rates were reasonable and were for services performed. *Id.* at 13-14. These arguments are without merit.

**1.    HUD's Enforcement Actions Have Made Clear That The Filed Rate Doctrine Does Not Apply To Plaintiffs' Claims.**

Defendants' argument that the filed rate doctrine somehow insulates their conduct from constituting a violation of Section 8 of RESPA is completely without merit. Defendants essentially claim that Plaintiffs cannot assert that Countrywide's captive reinsurance scheme violates RESPA because mortgage insurance rates are filed with the state. However, as Countrywide's very own in-house counsel has already explained in a recent article, the U.S. Department of Housing and Urban Development ("HUD") has

recently and aggressively pursued companies engaging in similar practices in the title insurance industry. *See* Joseph Kolar, Robert Jaworski, Susan Kelsey, Donald Blanchard, and Clinton Rockwell, RESPA Review: "Kicking Back" and "Doing the Splits," The Business Lawyer Vol. 62, at 599-603 (February 2007) ("RESPA Article").[10]  Like mortgage insurance rates, title insurance rates are generally regulated by the states.  In the majority of states, title insurance underwriters are required to file their rates with the state department of insurance.  Several states—including Pennsylvania—go so far as to actually promulgate the rates that are charged for title insurance.  Regardless of state regulation of title insurance rates, HUD found that sham captive title reinsurance schemes violate RESPA and aggressively pursued violators.  As Countrywide's own in-house counsel noted in their co-authored article, HUD issued strong, unambiguous, direct statements against these practices.  Before the U.S. House Committee on Financial Services in April 2006, HUD Deputy Assistant Secretary for Regulatory Affairs and Manufactured Housing Gary Cunningham testified:

> It is HUD's position that it is a violation of section 8(a) of RESPA to accept a thing of value in the form of participation in money-making captive title reinsurance arrangements in return for the referral of settlement service business without valuable services being performed.  It is further HUD's position that any captive title reinsurance arrangement in which payments to the reinsurer are not bona fide compensation and exceed the value of the reinsurance, violated section 8 of RESPA.

RESPA Article at 601 (quoting statement of Gary M. Cunningham).  Thus, the fact that title insurance rates are regulated by the states simply had no bearing whatsoever on the liability of a lender for utilizing a sham captive reinsurance scheme in violation of

---

[10] Co-authors Susan Kelsey and Donald Blanchard are/were senior attorneys in Countrywide's Legal Division.

RESPA. As further evidence of this, as noted in the RESPA Article, following Mr. Cunningham's Congressional testimony, HUD announced several settlements involving captive title reinsurance arrangements—at least one which was against a lender with an affiliated reinsurer. See RESPA Article at 602. If Defendants' argument was correct, HUD would, arguably, have found that captive title reinsurance schemes were unassailable because title insurance rates are regulated by the states; however, HUD clearly found—and testified before the United States Congress—that sham captive reinsurance arrangements violated RESPA. Indeed, as noted in the RESPA Article, HUD further condemned such arrangements, despite the fact that title insurance rates are generally regulated by the states:

> …such an arrangement between an entity or an affiliate of an entity that is in a position to refer business to the primary title insurer and the primary insurer are [sic] deserving of close scrutiny. When there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

RESPA Article, p. 601. This mirrors the allegations set forth in the Complaint. ¶¶ 65-67. Defendants cannot dodge liability by hiding behind the filed rate doctrine, as it is simply inapplicable to this case and absolutely irrelevant to an analysis of whether Defendants have violated Section 8 of RESPA.

## 2. The Filed Rate Doctrine was Created Only for the Utilities Industry

Defendants' entire argument is also undone by the mere fact that the filed rate doctrine was *never* meant to apply to RESPA; rather it was intended to apply to the utilities industry. The filed rate doctrine came into being when Congress passed the

Federal Communications Act of 1934.[11]  The doctrine "requires that common carriers file with the Federal Communications Commission ("FCC") schedules of their charges, as well as regulations, classifications, and practices affecting such charges." 47 U.S.C. § 203(a).  Courts have held that, under the filed rate doctrine, "tariffs validly filed in accordance with 47 U.S.C. § 203 operate to conclusively and exclusively control the rights and liabilities between the parties."   Although a small number of courts have erroneously applied this doctrine outside the realm of the utilities industry, there is no support for the contention that Congress intended the doctrine to apply outside the utilities industry.  *See Chesner v. Stewart Title Guaranty Co.*, No. 06-CV- 476, 2006 U.S. Dist. LEXIS 57356, *20 (N.D. Ohio Aug. 4, 2006) (noting defendant's failure to provide "case law demonstrating the 'filed rate doctrine' applies outside the public utilities or common carrier arenas").  Thus, the filed rate doctrine was not meant to be applicable to state mortgage insurance filings.

Within the last few years, even the Federal Communications Commission ("FCC") has shied away from applying the filed-rate doctrine.  *Davel Communs., Inc. v. Qwest Corp.*, 460 F.3d 1075, 1084-1085 (9th Cir. 2006).  The reason for this change was that the FCC concluded that "eliminating the ability of carriers to invoke the filed-rate doctrine benefits consumers by creating a legal relationship that more closely resembles the legal relationship between service providers and customers in an unregulated environment, and is in the public interest."  12 F.C.C.R. 15014, 15058 (1997) (order on reconsideration).   This shift in policy was aided by Congress' passage of the

---

[11] See Necessity Never Made a Good Bargain: When Consumer Arbitration Agreements Prohibit Class Relief, 31 Fla. St. U.L. Rev. 1005 (Summer 2004).

Telecommunications Act of 1996 to grant the FCC authority to "refrain from applying the filed rate doctrine." Burch, Thomas, *Necessity Never Made a Good Bargain*, 31 Fla. St. U.L. Rev. 1005 at 1019 (2004). "Under its new authority, the FCC issued a series of orders notifying . . . carriers – that they no longer had to comply with the filed rate doctrine. *Id*.

The FCC's actions demonstrate a clear trend toward allowing consumer protection laws to prevail over the filed-rate doctrine. It is thus consistent with the FCC's actions that the filed-rate doctrine does not supersede RESPA. After all, as RESPA is a federal consumer protection statue (*see Rawlings*, 64 F. Supp. 2d at 1165-1166), its very purpose is to provide a source of protection and remedy for consumers. If Defendants' view of the filed rate doctrine is accepted by the Court, the purpose of RESPA would be eviscerated. This bizarre, inequitable result is especially undesirable in this case, where Defendants seek to invoke state law to defeat a federal statute. Simply put, the filed rate doctrine was never intended to prevent consumers from pursuing RESPA claims. Accordingly, Defendants—a lender and its affiliated reinsurer—cannot escape liability for their conduct merely because non-party mortgage insurers' rates are regulated by the states.

### 3. Mortgage Reinsurance Rates Are Not Regulated by Any Pennsylvania Regulatory Body

The Defendants' claim that the Plaintiffs may adjudicate their RESPA kickback/fee-splitting claims through the Pennsylvania Insurance Department is clearly erroneous. Yet another fallacy in Defendants' arguments is the fact that mortgage reinsurance premiums are not "comprehensively regulated by the Commonwealth of Pennsylvania." Def. Mem. at 6. 40 Pa. Cons. Stat. Ann. §§ 710-1 to 710-19 which

Defendants cite, specifically states that "[t]his article shall not apply to . . . [r]einsurance other than statutorily authorized joint reinsurance mechanisms." 40 P.S. § 710-4 (a)(1). Defendants thus undercut their own argument. Here, the kickback/fee-splitting scheme that Plaintiffs challenge was effectuated through the reinsurance premiums collected by Countrywide through its captive reinsurance subsidiary. ¶¶ 86-88. Because the allegations of the Complaint invoke the impropriety of the reinsurance agreements at issue, in and of themselves, the RESPA violations alleged by Plaintiffs are inarguably beyond the reach of the Pennsylvania Insurance Department.

### 4.    A Filed Rate Does Not Shield A Defendant From Deceptive Rates

Despite Defendants' misplaced invocation of the filed rate doctrine, the doctrine was actually designed to protect *consumers* from predatory service providers who may seek to overcharge consumers in the absence of regulatory oversight. It stands to reason, then, that a service provider cannot invoke the filed rate doctrine to protect itself from a deceptive rate which has been approved by a regulatory body. As one court noted:

> The filed tariff [or rate] doctrine is designed to protect utilities charging filed rates for lawfully provided service. It is of no help to a defendant which fraudulently induces a plaintiff to pay a filed rate or which otherwise exacts payment by fraud. There is nothing in the policy underpinnings of the doctrine which would cause it to protect a defendant which unlawfully exacts payment, even at a lawful rate.

*Gelb v. Am. Tel. & Tel. Co.*, 813 F. Supp. 1022, 1031 (S.D.N.Y. 1993); *see also Charles v. Lawyers Title Ins. Corp.*, No. 06-CV-2361, 2007 WL 1959253, at *7 (D.N.J. July 3, 2007) ("It simply cannot be that an industry which is required, by law, to file the rates it charges with an administrative agency or governmental entity can be shielded from any fraud or negligent misrepresentation claims based on that fact."). Here, Plaintiffs have

adequately alleged that the rates they paid were artificially inflated and/or Defendants'
reinsurance scheme involved the illegal collection of unearned fees. Accordingly,
Defendants cannot invoke the filed rate doctrine, even if the primary mortgage insurance
rates were approved by a regulatory commission. ¶ 68.

### B. Even if the Filed Rate Doctrine Did Apply, Plaintiffs Have Sufficiently Alleged Injury In Fact

The primary purpose of the RESPA was to implement "significant reforms in the
real estate settlement process" to protect borrowers from "unnecessarily high settlement
charges caused by certain abusive practices." 12 U.S.C. § 2601(a). Specifically, Section
8 of RESPA prohibits: 1) the giving or accepting of any "fee, kickback, or thing of value"
in exchange for the referral of real estate settlement service business; and 2) the charging
of "unearned fees" in connection with the provision of such settlement services.

The doctrine of standing finds its origin in the "case or controversy" requirement
of Article III of the Constitution. The Supreme Court has determined that the "irreducible
constitutional minimum of standing" contains three elements:

> First, the plaintiff must have suffered an "injury in fact"—
> an invasion of a legally protected interest which is (a)
> concrete and particularized, and (b) "actual or imminent,
> not 'conjectural' or 'hypothetical.'" Second, there must be
> a causal connection between the injury and the conduct
> complained of—the injury has to be "fairly . . . trace[able]
> to the challenged action of the defendant, and not . . . th[e]
> result [of] the independent action of some third party not
> before the court." Third, it must be "likely," as opposed to
> merely "speculative," that the injury will be "redressed by a
> favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (citations omitted). *See
also, Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 484-85
(3d Cir. 1998) (citing Lujan at 560-61).

As the Supreme Court has indicated, however, the issue of whether a plaintiff has standing "often turns on the nature and source of the claim asserted. The actual or threatened injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing. . . .'" *Worth v. Seldin*, 422 U.S. 490, 500 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)). In this case, it is Section 8 RESPA, as amended, which provides Plaintiff with her legal right, and the standing to seek recourse in court to protect such right.

### 1.    The 1983 Amendment to Section 8 of RESPA

The main purpose of the 1983 amendment to Section 8 of RESPA was to address precisely the type of conduct being challenged by Plaintiff.  In conjunction with the new language in Section 8, Congress also amended Section 8(d)(2) to ensure that a private right of action would be available against parties to captive reinsurance agreements. Because captive reinsurance agreements often-times do not involve the direct payment of a referral fee or fee split, Section 8(d)(2) was amended to provide for the calculation of the statutory penalty to be made, not on the amount of the referral payment or fee split (as had been the case prior to the amendment), but on the entire amount of the settlement service fees at issue. The 1983 House Committee Report explains the amendment to Section 8(d)(2) as follows:

> If the persons involved in controlled business arrangements violate the conditions governing such arrangements, they shall be jointly and severally liable to the persons whose settlement service is involved in the amount of three times the amount of the charge paid for the settlement service plus court costs and reasonable attorneys' fees.

H.R. Rep. No. 98-123, 98th Cong., 1st Sess. at p. 77 (1983).

The 1983 amendment to Section 8(d)(2) reveals Congress' intention to create a statutory remedy for private enforcement actions to challenge noncompliance with RESPA's requirements, and Plaintiff has thus alleged an "injury in fact" which satisfies Article III's standing requirements.

### 2.     *Kahrer v. Ameriquest* **and Subsequent Decisions**

Recently, another member of this Court and at least three other courts have recognized the significance of the 1983 amendments to RESPA for purposes of interpreting Section 8(d)(2), and all have concluded that a plaintiff need ***not*** allege a quantifiable economic injury in order to have standing to sue for a RESPA violation. *See e.g. Kahrer v. Ameriquest*, 418 F.Supp. 2d 748, 756 (W.D. Pa. 2006) ("plaintiff need not allege that she has been overcharged for the settlement services provided by [defendant] in order to bring a private right of action under Section 8 of RESPA"); *Robinson v. Fountainhead Title Group Corp.*, 447 F.Supp. 2d 478, 489 (D. Md. 2006) ("[I]njury in a RESPA case can be shown by harm other than allegations of overcharges."); *Pettrey v. Enterprise Title Agency, Inc.*, 241 F.R.D. 268, (N.D. Ohio 2006) (Damages properly based upon the amount of the total settlement service charge.)

In a case that Defendants neglected to cite in their Memorandum of Law, this Court recently agreed with the *Kahrer* analysis in *Yates v. All American Abstract Company*, 487 F.Supp.2d 579, 581-582 (E.D. Pa. 2007) ("Having considered the pertinent cases relied upon by each party, we are persuaded by the cogent reasoning of *Kahrer*, and need not repeat it here.")

The *Robinson* decision cited above analyzed the standing issue in the context of a RESPA claim, stating:

> This Court agrees with the detailed reasoning set forth in
> Kahrer, which is further supported by the Fourth Circuit's

> finding in *Boulware* [*Boulware v. Crossland Mortgage Corp.*, 291 F.3d 261 (4th Cir. 2002)] that injury in a RESPA case can be shown by harm other than allegations of overcharges. In the present case, in addition to the overcharges alleged, the alleged §8(a) violation presents the possibility for other harm, including a lack of impartiality in the referral and a reduction of competition between settlement service providers. As such, the Court finds that Plaintiff has properly alleged an §8(a) claim against Fountainhead and she has the requisite standing to pursue such claim.

Id. at 489.

In another case, this Court has previously endorsed the propriety of Constitutional standing being derivative of a statutory grant of a non-quantifiable injury. Specifically, in *Miller v. Nissan Motor Acceptance Corp.*, No. 99-CV-4953, 2000 U.S. Dist. LEXIS 15645, at *85 n.64 (E.D. Pa. Oct. 27, 2000) (Dalzell, J.), addressing whether the Consumer Leasing Act, 15 U.S.C. § 1640, conferred standing, the Court stated:

> Clearly, a statute's damage provision cannot overcome Article III standing requirements. Instead, § 1640 goes to suggest that not all CLA injuries will be directly calculable in dollars. While this **lesser concept would seem to be more easily seen in circumstances alleging, for example, disclosure violations, it may equally apply in a circumstance where the damages are difficult to quantify.**

(emphasis added), *reversed in part on other grounds*, 362 F.3d 209 (3d Cir. 2004).[12]

---

[12] Indeed, federal courts have routinely recognized the existence of Article III standing in connection with analogous statutory claims. *See, e.g., Robey v. Shapiro, Marianos & Cejda, LLC.*, 434 F.3d 1208, 1210-1212 (10th Cir. 2006)(Plaintiff asserting claim under the Fair Debt Collection Practices Act not required to establish monetary injury as a prerequisite to Article III standing); *Razilov v. Nationwide Mutual Ins. Co.*, 2004 WL 3090083, *7 (D. Or. March 3, 2004)("The Laphams maintain they have standing to bring this action even if they suffered no actual monetary damages because actual monetary damages do not have to be proven in an action to enforce liability under FCRA. The Court agrees. A party who willfully fails to comply with FCRA's requirements is liable to a consumer for actual damages, punitive damages, attorneys'

Defendants' argument that Plaintiffs cannot allege injury in fact because they cannot allege an overcharge is nonsensical. This argument is based on the minority and often discredited view that Section 8 of RESPA only allows for recovery of an overcharge.

Here, Defendants admit that Plaintiffs did allege an injury. Def. Mem. at 11; ¶¶ 90-93. Plaintiffs' need allege no more. Further, Plaintiffs' allegations of injury are not solely based upon an overcharge. ¶ 92. Plaintiffs' allegations of injury are enough to distinguish the instant case from those cited by Defendants. *See, e.g., Mullinax v. Radian Guar., Inc.*, 311 F. Supp. 2d 474, 481 (M.D.N.C. 2004) (dismissing case because "[p]laintiffs have not alleged that they were overcharged for primary mortgage insurance and therefore they were not injured"); *Morales v. Attorneys' Title Ins. Fraud, Inc.*, 983 F. Supp. 1418, 1429 (S.D. Fla. 1997) (finding no standing because plaintiffs did not claim they were overcharged for primary mortgage insurance.); *Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819, 824-826 (E.D. Tex. 2002) , *affirmed*, 69 Fed. Appx. 659 (5th Cir. 2003) (Plaintiffs neglected to allege overcharge for settlement services).

Furthermore, highly persuasive case law holds that proof of an overcharge is not required for a claim under Section 8 of RESPA.[13] Thus, a plaintiff can indeed allege "injury in fact" without proof of overcharge. In other words, an overcharge is not a required element of a RESPA Section 8 violation. As alleged in paragraph 92 of the

---

fees, and costs . . . . Accordingly, the Court holds that the Laphams have standing to bring this action even if they ultimately fail to prove actual out-of-pocket damages.")

[13] *See Edwards v. The First Am. Corp., et al.*, No. 07-3796, 2007 U.S. Dist. LEXIS 80008 (C.D. Cal. Oct. 11, 2007) (In denying defendants motion to dismiss, for the same reasons argued by Defendants in the case at bar, Judge Otero held that a plaintiff "need not have suffered an overcharge to invoke the protection of RESPA.")

Complaint, Plaintiffs and the Class were also harmed because they were entitled—under the express, unambiguous language of the statute—to: (a) obtain settlement services from providers that did not participate in unlawful kickback scheme; and (b) pay settlement service charges that were not unlawfully split with Countrywide's captive reinsurer. Defendants' "overcharge" theory is based upon an erroneous interpretation of the RESPA Section 8 damages provision.  This section *clearly* provides for damages in amount equal to three times the fee paid for the settlement service.  12 U.S.C. § 2607(d)(2).  As the court noted in *Kahrer v. Ameriquest*, 418 F. Supp. 2d 748, 756 (W.D. Pa. 2005), "RESPA gives consumers the right, enforceable by a private cause of action for statutory damages, the right to purchase settlement services from companies that have not participated in a kickback scheme."

Indeed, as noted by Countrywide's own in-house counsel, the *Kahrer* court, after examining the legislative history of RESPA, determined the following:

> The statute was amended in 1983, however, at which time the language entitling one to recover three times the 'thing of value' was replaced by the language at issue here which provides for liability for violating the statute in an amount equal to three times the amount of 'any charge paid for such settlement services.' Had Congress intended for liability to be limited to three times the overpayment or the 'thing of value' as it had been since 1974 it would have had no need to amend the statute as it did.

*Id*. at 754; RESPA Article at 612; *see also Yates v. All Am. Abstract Co.*, No. 06-CV-2174, 2007 U.S. Dist. LEXIS 34266, at * 7 (E.D. Pa. May 10, 2007) ("Having considered the pertinent cases relied upon by each party, we are persuaded by the cogent reasoning in *Kahrer* . . . .  We hold that *Yates* may seek three times the amount she paid for any settlement services, regardless of whether she actually paid a "mark up.");  *Pedraza v. United Guaranty Corp.*, 114 F. Supp. 2d 1347, 1351 (S.D. Ga. 2000) (setting

forth its interpretation that "Section 2607(d)(2) allows persons whose cost for settlement services were incurred in violation of anti-kickback provision to recover treble the cost of such unlawful charge, regardless of whether such a person actually paid an inflated cost for such services."); *Patton v. Triad Guaranty Ins. Corp.*, No. 00-CV-0132 at p. 11 (S.D. Ga. October 10, 2002) (The proper measure of damages under RESPA "is three times the entire amount paid for the settlement services involved in the alleged kickback scheme, not three times the difference between what was actually paid and what should have been paid.") (Opinion denying summary judgment).

The findings of these courts are reasonable and follow the clear, unambiguous language of the statute.  As the Court in *Kahrer* aptly noted,

> In this manner, *Durr* [*Durr v. Intercounty Title Co.*, 826 F. Supp. 259 (N.D. Ill 1993)] upon which the *Morales* Court [*Morales v. Attorneys' Title Insurance Fund, Inc.*] relied, is equally flawed as the Court in that case did not analyze the statute or the legislative history at all but merely concluded, without discussion, that the plain meaning of 'three time the amount of any charge paid for such settlement services' means three times the overcharge.  The fact that Congress eliminated the language in the damage provision regarding the proscribed payment when it amended the statute in 1983, however, appears contrary to the *Durr* Court's conclusion and, thus, *Durr* cannot provide the basis for finding that failure to allege an overcharge is fatal to plaintiff's claim.

*Id.* at 754; *See also Robinson v. Fountainhead Title Group Corp.,* No. 03-CV-3106 at 18-19 (August 9, 2006 D. Md.) (agreeing with the detailed reasoning set forth in *Kahrer*). This same flawed reason was utilized by the cases cited by Defendants.  *See, e.g., Moore, supra*, 233 F. Supp. 2d at 824-826 (cited at Def. Mem. at 11).

In *Berger, et al. v. Property I.D. Corp., et al.,* No. 05-CV-5373-GHK (CWx) (C.D. Cal. Aug. 17, 2007 ) the Court held as follows:

23

> We read the plain language of this provision to establish that, when a person has been charged for a settlement service involved in the violation of RESPA, he may recover "an amount equal to three times the amount of any charge paid for such settlement service."  It is plain from the grammar of the statute that the phrase "involved in this violation" modifies the immediately preceding term "service" to mean that RESPA –violating defendants are liable for damages only with respect to the specific services that were provided in connect with the violations of the statute.

*Id.* at Page 5.  The Court further stated, "The kickbacks and fee splits that violate the statute are charges that the plaintiff is *not actually paying in exchange for services*.  They are fees that are being illegally diverted back to the referring party.  To conclude that only this diverted portion of the payment, which is not payment for "settlement services" at all, should be considered the totality of "the amount of *any* charge paid for such settlement service" would be an unreasonable reading of the statute."  *Id.* at p 6.

Moreover, courts analyzing similar consumer protection statutes to RESPA have not hesitated to find an injury in fact upon violation of the said statute.  For instance, in claims brought pursuant to the Fair and Accurate Transaction Act of 2003 ("FACTA"), the Court in *Ehrheart v. Lifetime Brands, Inc.,* No. Civ. A. 07-1433, 2007 WL 2141979 (E.D. Pa. July 20, 2007) first noted that "FACTA . . . created a right to electronically printed receipts that truncate the consumer's credit card number and which do not print the expiration date of the consumer's credit card. 15 U.S. C. § 1681c(g)."  *Id.* at * 2.  The Court determined that once a violation of that statue had been alleged – *i.e.* the plaintiff received a receipt which did not truncate the plaintiff's credit card number – an injury under FACTA had occurred.  *Id.  See also Korman v. Walking Co.,* No. 07-CV-1557, 2007 WL 2437958 (E.D. Pa. Aug. 28, 2007) (Same);  *See also Havens Realty Corp. v.*

*Coleman* 455 U.S. 363 (1982) (finding an injury in fact where defendants violated the Fair Housing Act).

The findings in the cases cited by Defendants for support of their standing argument – *Moore v. Radian Group., Inc.,* 233 F. Supp. 2d 819 (E.D. Tex. 2002), *Carter v. Welles-Bowen Realty, Inc.,* 233 F. Supp. 2d 819 (E.D. Tex. 2002)*, and *Mullinax v. Radian Guar., Inc.*, 311 F. Supp. 2d 474 (M.D.N.C. 2004) have been specifically refuted by relevant authority.  In the Eastern District of Pennsylvania criticized *Moore*, as well as *Carter and Mullinax*, in holding:

> We find the *Kahrer* line of cases more persuasive. First, limiting RESPA § 8(d)(2)'s "any charge paid" language to overcharges is less consistent with the plain language of the statute than reading the locution as including the entirety of the settlement charge. Second, the 1983 amendment changed RESPA's statutory language in important ways that the Moore line fails to acknowledge. Third, the *Moore* line relies on a narrow reading of Congress's purpose of protecting consumers from unnecessarily high settlement charges. RESPA allows individuals to police the marketplace in order to ensure impartiality of referrals and competition between settlement service providers, thereby creating a market-wide deterrent against unnecessarily high settlement costs. Suits without overcharges thus advance Congress's goals under this statute.
>
> Therefore, Capell does not have to allege an overcharge to state a claim under RESPA.

*Id.*, No. 07-CV-1901, 2007 U.S. Dist. LEXIS 82570 * 14-15 (E.D. Pa. 2007).

### C.    Section 8 (c)'s Safe Harbor Does Not Save Defendants.

There is also no validity to Defendants' claim that they satisfied RESPA section 8's safe harbor provision which states that "nothing in RESPA prohibits a charge for a settlement service that is reasonably related to value of the goods or services provided." Def. Mem. at 13 (citing 12 U.S.C. § 2607(c)(2).   As alleged in the Complaint,

Countrywide essentially performed no services in extracting an inflated portion of mortgage insurance paid by Plaintiffs. ¶¶ 61, 65-67.

HUD has specifically recognized the potential for a lender to manipulate captive reinsurance arrangements in such as manner as to, essentially, circumvent RESPA's protective provisions. In a letter dated August 6, 1997 -- addressed *to* Countrywide (the "HUD letter") -- HUD expressed concern over the problem and warned that captive mortgage reinsurance arrangements must provide for adequate transfer of actual risk in order to pass muster under RESPA. Specifically, the HUD letter cautioned that captive mortgage reinsurance arrangements are permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original). *See also* RESPA Article at 601 (quoting statement of Gary M. Cunningham which strongly questioned the legality of directly analogous captive reinsurance agreements).

However, Defendants' captive reinsurance arrangements do not satisfy these requirements, as the payments to Countrywide's captive reinsurer are not at all commensurate with the transfer of risk and far exceed the value of any services actually performed.[14]

---

[14] Defendants' reliance on *Contawe v. Crescent Heights of Am., Inc.*, No. 04-CV-2304, 2004 WL 2244538 (E.D. Pa. Oct. 1, 2004), is of no moment as that Court specifically found that, unlike the present case, "Plaintiffs' Complaint does not allege that the settlement fee they paid was *inflated* or in any way higher than reasonable considering the nature of the services provided by Defendant." *Id.* at *4 (emphasis added).

**III.    The *Burford* Abstention Doctrine Is Inapplicable To This Matter**

Abstention is a judicially created doctrine under which a federal court will decline to exercise its jurisdiction so that a state court or agency will have the opportunity to decide the matters at issue. *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission*, 791 F.2d 1111, 1114 (3d Cir. 1986). The doctrine is rooted in concerns for the maintenance of the federal system and "represents an extraordinary and narrow exception to the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.'" *Id.* (*quoting Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976)). To put it another way, "abstention from the exercise of federal jurisdiction is appropriate only under certain limited circumstances." *Chez Sez III Corp. v. Township of Union*, 945 F. 2d 628, 630 (3d Cir. 1991) (citation omitted). Those circumstances are loosely gathered under discrete concepts of abstention named after leading Supreme Court Cases. In the instant case, the Supreme Court case cited by Defendants is "*Burford*" (*Burford v. Sun Oil Co.*, 319 U.S. 315, 87 L.Ed. 1424, 63 S.Ct. 1098 (1943)).

Defendants' reliance on the *Burford* Abstention doctrine - which seeks to protect state interests - is misplaced, as Plaintiffs' sole alleged claim is for violation of RESPA, a federal statute. Moreover, the prerequisites for the application of the *Burford* abstention doctrine are lacking.

**A.    *Burford* Abstention Applies Only In "Extraordinary" Circumstances Which Are Not Present Here**

In *Burford*, the Supreme Court held that a federal court should refuse to exercise its jurisdiction in a manner that would interfere with a state's efforts to regulate an area of law in which state interests predominate and in which adequate and timely state review of

the regulatory scheme is available. *Chiropractic Am. v. LaVacchia*, 180 F.3d at 104

(*citing Burford*, 319 U.S. at 332-334). The purpose of *Burford* is to "avoid federal

intrusion into matters of local concern and which are within the special competence of

local courts." *Id.* (citation omitted). The Supreme Court has "provided a clear definition

of the *Burford* doctrine." *Chiropractic America*, 180 F.3d at 104. In *New Orleans Pub.*

*Serv. Inc. v. Council of the City of New Orleans*, the Court wrote:

> Where timely and adequate state-court review is available,
> **a federal court sitting in equity** must decline to interfere
> with the proceedings or orders of state administrative
> agencies: (1) when there are "difficult questions of state
> law bearing on policy problems of substantial public import
> whose importance transcends the result of the case then at
> bar"; or (2) where the "exercise of federal review of the
> question in a case and in similar cases would be disruptive
> of state efforts to establish a coherent policy with respect to
> a matter of substantial public concern.

491 U.S. 350, 361, 105 L. Ed. 2d 298, 109 S. Ct. 2506 (1989) (emphasis added).

*Burford* abstention therefore "calls for a two-step analysis." *Riley v. Simmons*, 45

F.3d 764, 771 (3d Cir. 1995) (*citing New Orleans*, 491 U.S. at 361). "The first question

is whether timely and adequate state law review is available." *Id.* (citation omitted).

"Only if a district court determines that such review is available, should it turn to other

issues and determine on the state's public policy or whether the district court's exercise

of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent

public policy on a matter of important state concern." *Id.*[15]

---

[15] *See also* <u>*Grode v. Mutual Fire, Marine & Inland Ins. Co.*, 8 F.3d 953, 960 (3d Cir. 1993)</u> (reversing judgment of district court that abstained from exercising jurisdiction under *Burford*).

The second prong of the *Burford* doctrine, as refined in *New Orleans*, requires a court to examine three issues: "(1) whether the particular regulatory scheme involves a matter of substantial public concern; (2) whether it is the sort of complex technical regulatory scheme to which the *Burford* abstention doctrine usually is applied; and (3) whether federal review of the party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." *Chiropractic America*, 180 F.3d at 105. [16]  Applying these requirements to this matter, it is obvious that there should be no abstention pursuant to *Burford*.

Initially, and dispositively, this action does not seek only equitable relief.  It seeks statutory damages under RESPA.  Moreover, even if there was not a limitation to the applicability of *Burford* to only equity actions, Defendants cannot satisfy the first prong of *Burford*.  In answer to the first question required under *Burford*, whether timely and adequate state law review is available, the answer must be no.  Defendants' citation to the Pennsylvania Unfair Insurance Practices Act does not provide for proceedings in a specialized court.

In *Markocki v. Old Republic Nat. Title Ins. Co.*, --F.Supp.2d --, 2007 WL 4142757 (E.D. Pa., Nov. 19, 2007), the plaintiff filed a complaint alleging violations of RESPA, as well as violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL").  The defendants moved to dismiss plaintiff's complaint arguing that the court did not have subject matter jurisdiction, because plaintiff failed to exhaust here administrative remedies under the Pennsylvania Title Insurance Companies Act ("TICA").  The court denied defendants' motion stating in relevant part:

---

[16] *See also Feige v. Sechrest*, 90 F.3d 846, 847 (3d Cir. 1996).

> Because of the weight of authority is against the exclusivity of administrative remedies, the motion to dismiss of lack of subject matter jurisdiction will be denied. … Furthermore, the Circuit Court's reasoning that [the Pennsylvania Unfair Insurance Practices Act] was not exhaustive because Pennsylvania law allows private actions for fraud connected to the insurance industry, should apply here. …Because CPL, under which Markocki brings her TICA claims, also provides a private right of action, TICA does not likely include a mandatory administrative remedy.

Id. at *4.

Further, in a case cited by Defendants, the court concluded that the *Burford* abstention doctrine was "***inappropriate with respect to plaintiffs' RESPA claims***, which … constitute suits for money damages." *See Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F.Supp. 1418, 1425 (S.D. Fla., 1997)(emphasis added).

Even if the Defendants could meet the first prong – which they cannot do – they still would not be able to satisfy the second prong of *Burford* because the adjudication of Plaintiffs' claims by a federal court will not interfere with the state's efforts to establish and maintain a coherent regulatory policy. The Pennsylvania Unfair Insurance Practices Act and this action easily co-exist without conflict. Defendants' argument that the RESPA claim has "the potential" to involve issues best determined by state regulators is insufficient to invoke the *Burford* doctrine. Defendants have not identified how determination of RESPA claims will interfere in any way with important Pennsylvania insurance laws. *Burford* abstention is not applicable in cases were there is merely "a 'potential for conflict' with state regulatory law or policy." [17]

The cases cited by Defendants are of no importance to this matter. In *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3 (1st Cir. 1977), *aff'd*, 438 U.S. 531 (1978), the

---

[17] *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706 (1996).

court granted plaintiff's motion to dismiss, reasoning, "The court's reluctance to take the case is understandable; recognizing a cause of action for the recovery of excessive past insurance premiums would profoundly affect the state's ratemaking machinery and policies." *Id*. at 13. Here, Plaintiffs are making a claim pursuant to a federal statute's damage provisions. Plaintiffs are not asking this Court to engage in retroactive rate setting.[18]

**IV.    Plaintiff Mary Alston's RESPA Claims Are Not Time Barred.**

Defendants erroneously argue that the claims of Plaintiff Mary Alston and similarly situated putative class members are time-barred because they were not brought within one year of December 22, 2006, when this case was filed. Defendants contend that the RESPA claims of Ms. Alston and the putative class members who closed their loans prior to December 22, 2005 are barred by the applicable statute of limitations because: (1) equitable tolling is not available under RESPA; and (2) even if equitable tolling is available under the Act, Plaintiffs have failed to plead fraudulent concealment with the requisite specificity. Def. Mem., 17-24. However, Defendants' arguments must fail because they are based upon the repugnant notion that Defendants should be protected from suit by virtue of their ability to successfully hide their illegal activities.

**A.    Equitable Tolling is Available for RESPA Claims**

Plaintiffs agree that Plaintiff Alston's transaction closed more than one year before the filing of the case. However, Plaintiffs contend that Alston's cause of action

---

[18] The other cases cited by Defendants are also unpersuasive. *Chiropractic America v. Lavecchia*, 180 F.3d 99 (3d Cir. 1999), *cert denied*, 528 U.S. 930 (1999) and *Smith v. Metro. Prop. & Liab. Ins. Co.*, 629 F.2d 757 (2d Cir. 1980), as both cases involve claims pursuant to the states' statutes.

did not begin to accrue at the time her transaction closed. The Third Circuit has held that, absent explicit statutory language to the contrary – namely an expressly stated link between expiration of a statute of limitations and the expiration of jurisdiction – equitable tolling will be read into a statute. *Ramadan v. The Chase Manhattan Corp*, 156 F. 3 499, 504 (3d Cir. 1998). In addition, at least two district court opinions have determined that the equitable tolling principles set forth in the *Ramadan* decision would apply to RESPA because the one year statute of limitations is not explicitly jurisdictional. *Solar v. Millenium Fin. Inc*., No. 01-CV-4327, 2002 U.S. Dist. LEXIS 8923 (E.D. Pa. May 17, 2002); *Smith v. Equicredit Corp.*, No. 01-CV-4326, 2002 U.S. Dist. LEXIS 19395 (E.D. Pa. Oct. 2, 2002). *See also Becker v. Chicago Title Ins. Co.*, No. 03-CV-2292, 2004 U.S. Dist. LEXIS 1988 (E.D. Pa. Feb. 4, 2004).

Moreover, sister courts have found equitable tolling to be applicable to RESPA. For instance, Judge Alsup in *Kay v. Wells Fargo, supra* found:

> Absent a clear indication to the contrary, equitable tolling should be read into every federal statute. *See Holmberg v. Ambrecht*, 327 U.S. 396–97 (1946). Two appellate decisions have addressed whether the statute of limitations in RESPA is subject to equitable tolling with two different results. The D.C. Circuit in *Hardin v. City Title & Escrow Company*, 797 F.2d 1037, 1040–41 (D.C. Cir. 1986), held that the statute of limitations was not subject to equitable tolling. The statute of limitations was in the same section, 12 U.S.C. 2614, that established jurisdiction for RESPA claims, evincing Congress' intent that the statute of limitations was jurisdictional. The decision also pointed out that 12 U.S.C. 2614 was "identical in all material respects" to 15 U.S.C. 1640(e), the statute of limitations for the Truth in Lending Act. *Id*. at 1039. The statute of limitations for the Truth in Lending Act had been held to be jurisdictional by some circuits. By analogy, so too was the statute of limitations for RESPA.

*See Id.* (Order Granting Motion to Strike and Vacating Hearing filed July 24, 2007).

This doctrine permits a court to extend a statute of limitations on a case-by-case basis to prevent inequity. *Corletto v. N.J. Transit Corp.*, 50 Fed. App. 513, 2002 U.S. App. LEXIS 15463 (3d Cir. 2002). Equitable tolling is appropriate in three situations: (1) when the defendant has actively misled the plaintiff respecting the facts which comprise the plaintiff's cause of action; (2) when the plaintiff in some extraordinary way has been prevented from asserting his rights; and (3) when the plaintiff has timely asserted his rights in the wrong forum. *U.S. v. Midgley*, 142 F. 3d 174 (3d Cir. 1998) (quoting *Kocian v. Getty Refining & Mktg Co.*, 7078 F.2d 748 (3d Cir. 1983). In addition, a plaintiff must have "exercised reasonable diligence in investigating and bringing the claims. *Miller v. New Jersey Dept of Corrections*, 145 F.3d 618 (3d Cir. 1998). Plaintiffs contend that the first instance is available to them in these situations.

### 1.    The Supreme Court has held equitable tolling should be read into every federal statute

The Supreme Court has held the equitable tolling doctrine should be read into every federal statute. *Holmberg v. Armbrecht*, 327 U.S. 392, 396-97 (1946). In particular, the Court reasoned "that where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered…." *Id*. at 397 (internal quotations, citations omitted). Plaintiff respectfully submits the instant case involves exactly the circumstances the Court identified in *Holmberg*. As alleged in the Complaint, Plaintiffs and the Class have been injured by Defendants' concealed, abusive, and unlawful utilization of their captive reinsurance arrangements and, accordingly, should be allowed to pursue their remedy in court.

### 2. Defendants' limited and non-binding precedent.

Defendants support their argument on two cases – *Zaremski v. Keystone Title Assocs., Inc.*, 884 F.2d 1391, reported at No. 88-CV-2569, 1989 WL 100656 (4th Cir. 1989); and *Hardin v. City Title & Escrow Co.*, 797 F.2d 1037 (D.C. Cir. 1986). *Zaremski* provides little support for Defendants' argument.  In that case, the court did not undertake an analysis of the applicability of equitable tolling to RESPA claims; rather, the court merely relied on *Hardin*.  *Zaremski*, 1989 WL 100656 at *1.  Moreover, *Zaremski* is an unpublished opinion from the Fourth Circuit and is not binding upon this Court.

Accordingly, then, Defendants essentially base their argument primarily on the holding of the D.C. Circuit in *Hardin*.  Plaintiffs respectfully submit that *Hardin* is an outlier decision, which—other than the unpublished *Zaremski* decision—is the only circuit court decision reaching this result.  *See Boudin v. Residential Essentials, LLC*, No. 07-0018-WS-C, 2007 WL 2023466 at * 4, FN 11 (S.D. Ala. July 10, 2007) (noting that "the only court known to have held that Section 2614 is jurisdictional and thus not amenable to equitable tolling relied on the language of the provision, noting that it is 'identical in all material respects' to TILA's limitations provision, including the heading of 'jurisdiction of courts; limitations [on actions]."  *Hardin,* 797 F.2d at 1039.  Because the Eleventh Circuit has held that TILA's provision *is* subject to equitable tolling, the substantive identity of RESPA's provision weighs in favor of, ***not against***, equitable tolling) (emphasis) (added).

Indeed, as discussed more fully herein, the opinion has been criticized by courts in the Third, Seventh, and Eleventh Circuits.  In fact, the Defendants recognize that in

*Ramadan*, the Third Circuit "declined to apply the reasoning of Hardin" Def. Memo at 19.

>    **3.     Both RESPA's purpose and HUD's enforcement actions
>             further support Plaintiffs' argument that RESPA claims
>             should be subject to equitable tolling.**

RESPA was enacted, in part, to curb the problems associated with kickbacks and under-the-table fee-splitting between and among real estate settlement service providers. 12 U.S.C.S. § 2601 (2006). Because the kickback agreements between lenders and reinsurers such as Defendants are necessarily very secretive, innocent consumers such as Plaintiffs and the absent Class members are often unable to uncover such schemes, particularly within one year of their real estate settlements. Indeed, as the Southern District of California recently explained:

>    kickbacks or referral fees may, by their very nature, be
>    secretive, making it difficult for an injured party to file a
>    complaint within the statutory period. Justice would not be
>    served by adhering to a strict interpretation of the statute of
>    limitations. It would essentially reward those perpetrators
>    who concealed their fraud long enough to time-bar their
>    victim's remedy.

*Rodriguez*, slip op. at 5 (internal quotations, citations omitted). The Supreme Court has indicated that in determining whether tolling of the statute of limitations is appropriate, the proper test is "whether tolling the limitation in a given context is consistent with the legislative scheme." *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 557-58, 94 S. Ct. 756, 768 (1974); *Burnett v. New York Cent. R.R.*, 380 U.S. 424, 426, 85 S. Ct. 1050, 1053 (1965) (stating that "the basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances."). RESPA expressly states that its purpose is to protect consumers from unnecessarily high settlement charges and certain abusive practices that have developed

in some areas of the country. *See Carr v. Home Tech Co., Inc.*, 476 F. Supp. 2d 859, 869 (W.D. Tenn. 2007) (citing 12 U.S.C. § 2601). In light of the remedial purposes of RESPA, several U.S. District Courts recently concluded equitable tolling applies to RESPA. *See Blaylock v. First American Title Ins. Co.*, 504 F. Supp. 2d 1091, 1107 (W.D. Wash. 2007) (holding equitable tolling applies to RESPA); *Boudin v. Residential Essentials, LLC*, No. 07-0018-WS-C, 2007 WL 2023466, at *4 (S.D. Ala. July 10, 2007) (not designated for publication) (same); *Carr*, 476 F. Supp. 2d at 869 (same).

Plaintiffs submit that both the RESPA's consumer-protective stance and the weight of authority on this issue are in favor of allowing equitable tolling under the Act.

### B.    Plaintiffs Have Met the Pleading Requirements for Equitable Tolling

The Complaint amply pleads that the statute of limitations for the claims of Ms. Alston and the similarly-situated Class members was and should be equitably tolled. In the Complaint, Plaintiffs adequately allege Defendants' involvement in a complex, undisclosed scheme in which Countrywide collected a portion of Plaintiffs' PMI payments through its affiliated captive reinsurer, Balboa, which far exceeded the value of the services, if any, that Balboa performed. Unbeknownst to Plaintiffs and the Class, there was either no real transfer of risk or the premiums paid were disproportionate to the amount of risk. Defendants argue that Plaintiffs must adequately allege affirmative actions by Countrywide to conceal facts about the alleged claim and that Plaintiffs did not have actual or constructive knowledge of the underlying facts, despite due diligence. Def. Mem. at 21. Defendants further state that Plaintiffs' allegations must satisfy the specificity requirements of Rule 9(b). *Id.* However, as explained by the Third Circuit, courts "should apply the rule [9(b)] with some flexibility and should not require plaintiffs

to plead issues that may have been concealed by the defendants." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998).

Pennsylvania law recognizes that "'in some circumstances, although the right to institute suit may arise, a party may not, despite the exercise of due diligence, reasonably discover that he has been injured.'" *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 231 (3d Cir. 2003) (quoting *Crouse v. Cyclops Industries*, 560 Pa. 394, 745 A.2d 606, 611 (Pa. 2000)). In such cases, the discovery rule will serve to toll "the running of the applicable statute of limitations until the complaining party knows or reasonably should know that she has been injured and that [her] injury has been caused by another party's conduct." *Crouse*, 745 A.2d at 611.

### 1. In any event, Plaintiffs have sufficiently pleaded facts showing Defendants' fraudulent concealment

Despite the fact that, as established above, Plaintiffs are not required to plead facts evidencing Defendants' fraudulent concealment, Plaintiffs have adequately pleaded such facts in the Complaint. Notably, three U.S. District Courts recently held that factual allegations sufficiently supported actual tolling of RESPA claims. *See Blaylock,* 504 F. Supp. 2d at 1108 (holding complaint sufficiently alleged facts that tolled RESPA claim); *Boudin*, No. 07-CV-0018, 2007 WL 2023466, at *5 (not designated for publication) (same); *Carr*, 476 F. Supp. 2d at 869 (same). Plaintiffs allege that Countrywide affirmatively misrepresented the nature of its relationship with PMI providers and failed to satisfy its disclosure obligations. ¶¶ 95-96.

Plaintiffs have alleged Defendants' conduct with particularity. Generally, Plaintiffs allege that Countrywide enters into captive reinsurance agreements, whereby it refers its borrowers to private mortgage insurers, who agree to reinsure with its affiliated

reinsurer Balboa. ¶ 57. However, the premium payments collected by Balboa far exceed the value, if any, of the services that Balboa actually furnishes or performs. ¶¶ 65, 67. Moreover, the HUD-1 provided to Plaintiffs did not provide the required notice that the reinsurer was receiving a share of the PMI.[19] In reality, therefore, Countrywide's captive reinsurance arrangements were and are simply sham transactions for collecting illegal kickbacks in return for referring private mortgage insurance business to certain insurers. ¶ 66. Plaintiff has sufficiently plead, with adequate particularity, facts supporting the application of the doctrine of equitable tolling.

Further, Defendants' egregious violations of RESPA are by their very nature hidden and exceedingly difficult to discover – especially for the average consumer. Accordingly, putative Class members who closed their loans prior to March 7, 2006 should not be penalized for failing to file suit earlier. Simply stated, equitable tolling is warranted precisely because of the self-concealing nature of Defendants' actions. Indeed, one court has stated:

> The purpose of the federal equitable tolling doctrine is to prevent a defendant from concealing a fraud, or committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it. Any plaintiff who is blamelessly

---

[19] *See* 24 C.F.R. Part 3500 App. A. § L. ("For all items except for those paid to and retained by the Lender, the name of the person ultimately receiving the payment should be shown."); *see also* 24 C.F.R. § 3500.8(b); *see also* Department of Housing and Urban Development Industry FAQs About RESPA No. 37 ("**May a settlement service provider charge a fee that reflects its own fee plus any recording fees as the service provider's fee? Example: An attorney charges $500 for its services and the county charges $30 for recording fees. May the attorney simply charge the consumer $530 and pay the county as a cost of doing business?** No. The "Line Item" instructions to the HUD-1 state that "[f]or all items except for those paid to and retained by the lender, the name of the person or firm ultimately receiving the payment should be shown." The attorney must disclose all entities ultimately receiving the fee.").

> ignorant of the existence or cause of his injury should be
> accorded the benefits of the more liberal equitable tolling
> standard.

*Moll v. U.S. Life Title Ins. Co. of New York*, 700 F. Supp. 1284, 1289 (S.D.N.Y. 1988). The instant matter is exactly such a circumstance.

Second, regardless of whether Defendants' kickback/fee-split scheme was self concealing, Plaintiffs have identified affirmative acts by Countrywide which constitute fraudulent concealment. Specifically, the Complaint alleges that Countrywide affirmatively misrepresented the true nature of its reinsurance arrangements by asserting that any share of the PMI premiums paid to its affiliated reinsurer would be in return for Balboa's assumption of a portion of the actual risk associated with the borrowers' loans. ¶¶ 95-96. The disclosure provided to Ms. Alston, for example, plainly stated that any portion of her premium that Balboa collected would be "in return for assuming a portion of the risk." The Complaint alleges that this statement was false. *Id.* Thus, Countrywide affirmatively misled its customers by benignly characterizing its captive reinsurance arrangements as simply being a part of the ordinary course of business—and, thus, being no cause for concern. Countrywide purposefully designed any "disclosure" in such a manner as to convey to borrowers that any amounts received by Balboa were for reinsurance services actually rendered -- i.e., for risk actually transferred to the reinsurer. Countrywide's "disclosure" was actually anything but a meaningful disclosure. Rather, Countrywide's "disclosure" was designed to keep borrowers in the dark; to prevent them from discovering the underlying basis of their RESPA claims.

**2.    Ms. Alston has adequately alleged/satisfied the due diligence requirement.**

The doctrine of equitable tolling looks to the reasonableness of the plaintiff's conduct, and whether she should have discovered the cause of action before the statute of limitations period expired.  The mere fact that Plaintiff Kevin Collier filed suit within one year of the closing of his loan does not, in any way, change the fact that Ms. Alston and the similarly-situated Class members would not, even in the exercise of due diligence, have known of the existence of a possible claim within one year of the closing of their loans, due to Defendants' affirmative acts, the secret nature of Defendants' scheme and the very nature of the captive reinsurance industry.

In addition to Defendants' affirmative acts in furtherance of the concealment described above and the self-concealing nature of the sham reinsurance scheme, the captive reinsurance agreements themselves also made the fraudulent conduct extremely difficult, if not impossible, for the challenged Class members to discover.  Captive reinsurance companies incorporated in Vermont —such as Balboa—are not required to file with the National Association of Insurance Commissioners ("NAIC") the type of detailed annual reports usually required of commercial insurance companies.  Thus, Ms. Alston or even the most sophisticated absent Class members could not, for example, simply contact the NAIC to obtain information on Balboa.

Even if Ms. Alston or similarly-situated absent Class members had somehow: (a) recognized that Countrywide's "disclosure" was misleading; (b) suspected that payments to Countrywide's reinsurance subsidiary were incommensurate with the level of risk actually transferred; (c) attempted to ascertain the relevant agreements and arrangements between Defendant Countrywide and its affiliated reinsurer Balboa; (d) attempted to

discover how much mortgage insurance premiums Balboa collected; and (e) attempted to discover Balboa's pertinent loss ratios for any given year, in the absence of a sophisticated expert and/or a subpoena, they would have likely been unable to do because such information is not readily publicly available.

### 3.    *Pedraza* and *Mullinax* are Distinguishable

Defendants rely upon *Pedraza*, supra, for their contention that "a captive reinsurance scheme is not a self-concealing wrong."  Def. Mem. at 20 (citing *Pedraza*, 114 F. Supp. 2d at 1357).  However, this proposed application of *Pedraza* to the instant case is improper and erroneous.  First, in *Pedraza*, the court noted that the plaintiff "does not allege that she had any dealings with [d]efendant." *Pedraza*, 114 F. Supp. 2d at 1356.  Here, the Complaint clearly alleges that Ms. Alston obtained a residential mortgage loan from Countrywide and paid for PMI from a provider with whom Defendants had a captive reinsurance arrangement.  ¶ 10.  Second, the *Pedraza* court noted that the plaintiff "simply provides no basis from which the Court could conclude that members of the class were ignorant of Defendant's unlawful conduct and, if they were, whether that ignorance was reasonable." *Pedraza*, 114 F. Supp. 2d at 1357.  Here, the Complaint clearly alleges that Countrywide affirmatively misrepresented the true nature of its captive reinsurance arrangements.  ¶¶ 95-96.  Further, the ignorance of Ms. Alston and the challenged class members was reasonable because pertinent information concerning Balboa is not readily publicly available from the NAIC.  Additionally, unlike in *Pedraza*, Ms. Alston's claims are asserted directly against the lender—the party with whom she directly dealt.  The

Complaint contains multiple allegations concerning the wrongful conduct of the lender, as well as its reinsurance affiliate.[20] ¶¶ 1, 5, 6, 57, 62, 86-90, 94-96.

### 4.    Countrywide's False Factual Assertions

Countrywide seeks to shirk Plaintiffs' allegations by cleverly claiming that it is not required to describe its reinsurance arrangements because reinsurance is not a settlement service. Def. Mem. at 22. This argument is obviously flawed. Defendants do not deny that PMI is a settlement service. Thus, as alleged in the Complaint, Countrywide was required to describe the true nature of its relationship with PMI providers—the use of which Countrywide did require. ¶ 95. As Defendants do not deny, this relationship directly involved Balboa. Further, Defendants do not deny that 12 U.S.C. § 2604(c) required Countrywide to describe the nature of its relationship with Ms. Alston's PMI provider. Further, as the Complaint alleges, Countrywide affirmatively misrepresented the nature of this relationship by plainly stating that any premium received by Balboa would be in return for assuming actual risk. ¶¶ 95-96.

Defendants also claim that Countrywide had no affirmative duty to inform its borrowers of its captive reinsurance arrangements. Def. Mem. at 23. However, in the HUD Letter, referenced in the Complaint, HUD has taken the position that a lender should not only inform its borrowers of its captive reinsurance arrangements, but provide

---

[20]    Defendants also point to *Mullinax*, 199 F. Supp.2d at 329. Plaintiffs submit that, regardless of whether Defendants' conduct was self-concealing, *Mullinax* is distinguishable from the instant case. The *Mullinax* court noted that the plaintiffs complaint did not provide sufficient details about the defendant's acts to conceal its alleged fraudulent scheme. In the instant case, Plaintiffs have clearly alleged that Defendants affirmatively misrepresented their scheme, so as to conceal the true nature of their captive reinsurance scheme. ¶¶ 95-96.

them with a "meaningful disclosure" and a "meaningful choice." HUD Letter at 5.[21] However, Countrywide did not provide Ms. Alston with such a meaningful disclosure or any choice at all; nor did the disclosure provided to her give her an opportunity to opt out. Plainly, the well-pled Complaint demonstrates why Ms. Alston and the challenged Class members could not, in the exercise of due diligence, have discovered Defendants' wrongdoing earlier. Thus, the Court should equitably toll the statute of limitations.

### 5.    Defendants' Statute of Limitations Argument Should Not Be Decided On Defendants' 12(b)(6) Motion to Dismiss

As indicated above, Defendants filed this 12(b)(6) motion to dismiss Plaintiffs' claims for damages under RESPA, claiming they are barred by the one (1) year statute of limitations. However, under the "Third Circuit Rule," a statute of limitations defense is only permitted to be raised by a motion under Rule 12(b)(6) if "the time alleged in the statement of a claim shows that the cause of action had not been brought within the statute of limitation." *First Am. Marketing Corp. v. Canella*, No. 03-CV-812, 2004 WL 250537 (E.D. Pa. Jan. 26, 2004) (quoting Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir.2002)). Furthermore, the "**affirmative defense of a statute of limitations is most properly determined in a motion for summary judgment because it requires consideration of evidence outside the pleadings.**" *Demetrius v. Marsh*, 560 F. Supp. 1157, 1158 (1983) (emphasis added). The issue of whether a Plaintiffs acted with "due diligence" would require an inquiry into factual issues such as when plaintiffs "discover[ed], or should by reasonable diligence have discovered, [their] injury." *Woll v.*

---

[21]      HUD indicates that the absence of a meaningful disclosure and meaningful choice is a factor which may cause it to give "particular scrutiny" to a lender's captive reinsurance arrangement. HUD Letter at 4-5.

*Fifth and Mitchell Street Corp.*, 96-CV-5973, 1997 WL 535936 (E.D. Pa. Jul. 31, 1997) at *3**.** Thus, this issue is not subject to resolution on a 12(b)(6) motion to dismiss, which is limited only to the factual pleadings. See *Id*. at *3.

Accordingly, the statute of limitations defense raised by Defendants in this 12(b)(6) motion is more appropriate for a motion for summary judgment because consideration of evidence outside the pleadings is necessary to determine whether the statute of limitations should be tolled due to fraudulent concealment. Furthermore, although there is no question that the Complaint alleges facts sufficient to establish a fraudulent concealment, whether Plaintiffs acted diligently is a question of fact that cannot be decided in this 12(b)(6) motion. The Court, therefore, should decline to dismiss Plaintiffs' damages claims for RESPA violations at this time.

In the alternative, if the Court should conclude that Plaintiffs have not adequately pleaded delayed accrual of the statute of limitations, it is respectfully submitted that this Court should allow Plaintiffs an opportunity to amend the Complaint to set forth the specific indicators of due diligence with respect to that prong of the equitable tolling doctrine. *See* 2A J. Moore, Moore's Federal Practice ¶ 12.07[2.-5], p. 12-99 (2d ed.1994); *accord In re Spree.com Corp.*, No. 01-CV-0161, 2001 WL 1518242 (E.D. Pa. Nov. 2, 2001) (stating that, should the court decide to grant a motion to dismiss under FED. R. CIV. P. 12(b)(6), the Plaintiffs should be provided an opportunity to file an amended complaint if it appears that the deficiencies can be corrected.).

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that this Court should deny Defendants' motion to dismiss and allow this case to proceed to the merits.

Alternatively, if the Court is inclined to grant the motion, Plaintiffs respectfully request leave to amend.

DATED:  December 7, 2007                **SCHIFFRIN BARROWAY TOPAZ &
                                         KESSLER, LLP**


                                          __/s/_ JHM6596_____
                                          Joseph H. Meltzer, Esq.
                                          Edward W. Ciolko, Esq.
                                          Mark K. Gyandoh, Esq.
                                          Joseph A. Weeden, Esq.
                                          280 King of Prussia Road
                                          Radnor, PA 19087
                                          Telephone: (610) 667-7706
                                          Facsimile: (610) 667-7056

                                             -and-

                                          Alan R. Plutzik, Of Counsel
                                          2125 Oak Grove Blvd., Suite 120
                                          Walnut Creek, CA 94598
                                          Telephone: (925) 945-0770
                                          Facsimile: (925) 945-8792

                                          **BERKE, BERKE & BERKE**
                                          Andrew L. Berke, Esq.
                                          420 Frazier Avenue
                                          Chattanooga, TN 37402
                                          Telephone: (423) 266-5171
                                          Facsimile: (423) 265-5307

                                          **TRAVIS & CALHOUN, P.C.**
                                          Eric G. Calhoun, Esq.
                                          1000 Providence Towers East
                                          5001 Spring Valley Road
                                          Dallas, Texas 75244
                                          Telephone: (972) 934-4100
                                          Facsimile: (972) 934-4101

                                          Attorneys for Plaintiffs